0UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES T. BIGGS, II,<br>    Plaintiff,<br><br>v.<br><br>MICHAEL ASTRUE,<br>Commissioner of Social Security,<br>    Defendant. | )<br>)<br>)   Civil Action No. 3:11-cv-00325<br>)   Judge Nixon/Brown<br>)<br>)<br>)<br>) |

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title II and Title XVI of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 23, 24, 30). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 17). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED**.

### I. INTRODUCTION

Plaintiff filed an application for DIB and SSI on March 30, 2007, with an alleged onset date of December 31, 2007. (Tr. 122-28). Plaintiff's application was denied initially and on reconsideration. (Tr. 72-75, 80-83). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 26, 2009 before ALJ Ronald Miller. (Tr. 21-62).

In his decision denying Plaintiff's claims, the ALJ made the following findings of fact

1

and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

2. The claimant has the [sic] hemophilia (coagulation defect); migraine headaches and major depressive order, which are found to be a "severe" combination of impairments, but not severe enough, either singly or in combination to meet or medically equal the requirements set forth in the Listing of Impairments. Appendix I to Subpart P, Regulations No. 4.

3. After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform a limited range of light work; lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; with frequent ability to use the bilateral hands; but no ability to work with knives or other sharp instruments; and must avoid unprotected heights and dangerous/moving machinery. Additionally, the claimant is able to understand and remember simple and detailed, but not complex tasks; sustain concentration and persistence for these tasks, despite periods of increased signs and symptoms; will experience some, but not substantial difficulty interacting with supervisors and the general public; can relate to co-workers; and is able to set limited goals and adapt to infrequent change.

4. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

5. The claimant is 31 years old, described as a younger individual (20 CFR 404.1563 and 416.963).

6. The claimant has an eleventh grade education and is able to communicate in English (20 CFR 404.1564 and 416.964).

7. Transferability of job skills is not an issue in this decision as the Medical-Vocational Rules support a finding that the claimant is "not disabled," (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

8. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

9. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2006, through the date of this decision (20 CFR 404.1520(g)

and 416.920(g)).

(Tr. 7-20).

The Appeals Council denied Plaintiff's request for review on February 18, 2011. (Tr. 478-81). This action was timely filed on April 5, 2011. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff saw Dr. Paul Yim at Axis Medical for primary care beginning in July 2002. (Tr. 320-43). Dr. Yim first treated him for chest pain and rectal bleeding in July 2002. (Tr. 338-339). Dr. Yim referred Plaintiff to Dr. Donald J. Russo, a cardiologist. (Tr. 297-98). Dr. Russo noted Plaintiff had a history of atypical chest pain and syncope. *Id*. He believed Plaintiff's significant anxiety was the possible cause of the syncope. *Id*. On August 13, 2002, Plaintiff had a tilt table evaluation that was normal except for a mildly blunted systemic vascular response to nitroglycerin. (Tr. (Tr. 340).

Dr. Yim also referred Plaintiff to Dr. Michel Kuzur at Tennessee Oncology, who noted Plaintiff's diagnosis of hemophilia-B, mild. (Tr. 294). He recommended Plaintiff avoid lifting more than 25 pounds due to his intermittent bleeds requiring transfusion and, if the problems continued, to change jobs altogether. *Id*. He also wrote that Plaintiff could not return to Vanderbilt due to a change in his insurance. *Id*

Around the same time, Dr. Yim referred Plaintiff to Dr. Allan Bailey for a colonoscopy. (Tr. 295-96). The colonoscopy showed internal hemorrhoids and anal fissure but no other lesions. (Tr. 295-96, 416). He recommended fiber supplementation. *Id*.

On September 5, 2002, Dr. Yim diagnosed Plaintiff with anxiety. (Tr. 337). A week later, on September 12, 2002, Plaintiff visited Dr. Yim to further discuss his anxiety and depression.

3

(Tr. 336). He noted he was having a hard time with work and noted he was isolating himself. *Id*. He had anxious and jittery legs. *Id*. Dr. Yim stated Plaintiff was "too jittery and anxious to work effectively" and "[m]ay qualify for disability." *Id*. On September 20, 2002, Plaintiff complained of chest pain, no energy, insomnia, and no appetite. (Tr. 335). In November and December, 2002, Plaintiff saw Dr. Yim four times for depression, bronchitis, hair loss, and anxiety. (Tr. 329-34). On January 10, 2003, Plaintiff complained of anxiety and depression but noted he felt improved from three months ago. (Tr. 328). Dr. Yim suggested counseling. *Id*.

Dr. Yim referred Plaintiff to Dr. Alan M. Elkins, a psychiatrist. (Tr. 299-300). Dr. Elkins noted that Dr. Yim believed Plaintiff was doing better but was unable to do his daily work. *Id*. Plaintiff's wife had just left him. *Id*. He noted Dr. Yim believed counseling would help, but it might take years. *Id*.

Dr. Yim continued treating Plaintiff for depression through February 2003. (Tr. 326-27). On February 7, Plaintiff complained that his depression felt worse than last time, but he denied any suicidal ideation. (Tr. 327). Dr. Yim recommended counseling at that appointment and at Plaintiff's February 28 appointment. *Id*.

On August 4, 2005, Plaintiff was treated at Vanderbilt University Hospital's emergency department for an altercation where he sustained a bruise to his head and a hand fracture. (Tr. 405-06). Plaintiff complained of worsening headaches and occasional blurred vision in the several days that had passed since the altercation. *Id*. Plaintiff had a head CT that was negative. *Id*. He was given factor replacement. *Id*

Plaintiff went to the emergency room at Sumner Medical Center on July 19, 2006. (Tr. 302-05). He complained of a left knee infection. *Id*. He stated he had not seen a doctor in several

4

years and had not had a problem with a bleed in that time. *Id*.

Plaintiff first saw Dr. Kenneth Dozier as his primary care physician on October 30, 2006. (Tr. 317). He complained of a knot under his chin that was sore to the touch and acute tonsilitis. *Id*. Dr. Dozier urged him to stop smoking. *Id*. He returned to Dr. Dozier on January 9, 2007, with complaints of neck and ear pain for one month. (Tr. 316). Dr. Dozier ordered an MRI of Plaintiff's neck and spine and prescribed pain medication. *Id*. The MRI of Plaintiff's spine was essentially normal, and the MRI of Plaintiff's head was normal. (Tr. 306-07). Plaintiff complained of worsening headaches at follow-up appointments on January 10 and January 12. (Tr. 314-15). He also reported a "bleed in leg muscle" on January 12. (Tr. 314). On January 19, 2007, Plaintiff reported panic attacks. (Tr. 312).[1]

On January 17, 2007, Plaintiff was treated at Vanderbilt's Hemostasis and Thrombosis Clinic. (Tr. 403). He complained of pain in his thigh and right lower quadrant. *Id*. A CT scan was ordered, and Plaintiff received factor IX. *Id*. The head CT showed no evidence of acute intracranial injury, but the abdominal CT showed a small right retropertoneal hemorrhage and likely intramuscular hemorrhage. (Tr. 400-01). He was discharged from the hospital on January 21, at his request. (Tr. 395-96). He returned to the hospital on January 22, complaining of "excruciating" pain. *Id*. He had not been compliant with his medication or with strict bed rest. *Id*. Plaintiff had a follow-up appointment and a planned factor infusion on January 24 and 26. (Tr. 393-94).

Plaintiff saw Dr. Dozier for a follow-up regarding his headaches on January 25, 2007. (Tr. 311). He reported anxiety and depression. *Id*. He stated he was unable to sleep and also

---

[1] It is somewhat unclear why Plaintiff reported this to Dr. Dozier, since he was apparently at Vanderbilt University Medical Center on that date.

5

complained of muscle bleeds and swelling. *Id*. He returned to Dr. Dozier's office again on March 20 complaining of headaches. (Tr. 310). Dr. Dozier noted he had a flat affect. *Id*.

On March 5, 2007, Plaintiff was referred to Todd Rutland, M.D. for chronic neck pain radiating into his left upper extremity. (Tr. 466-75). Dr. Rutland diagnosed cervical radiculopathy and ordered an MRI, which showed mild degenerative changes. *Id*. An EMG showed mild right wrist carpal tunnel with no definite evidence of radiculopathy. *Id*.

Plaintiff returned to Vanderbilt's Hemostasis and Thrombosis Clinic on March 21, 2007 for a routine follow-up. (Tr. 387-93). He noted significant improvement in his pain level and stated he no longer uses crutches but does limit activity. *Id*. He reported being diagnosed with nerve problems, specifically carpal tunnel, that might be causing his headaches. *Id*.

Plaintiff attended one session of prescribed physical therapy on April 4, 2007. (Tr. 476-77). He reported problems with bleeding. *Id*.

Plaintiff saw Dr. Dozier on April 30, 2007 with complaints of a headache, blood in his stool for one month, and a knot at his temple. (Tr. 309). Dr. Dozier noted Plaintiff was also suffering from depression. *Id*.

On May 3, 2007, Plaintiff returned to Dr. Yim for treatment. (Tr. 323). He complained of severe headaches, anxiety attacks, depression, and rectal bleeding. *Id*. Dr. Yim recommended Plaintiff see a psychiatrist and diagnosed occipital neuralgia. *Id*. He returned to Dr. Yim on June 7, complaining of worsening headaches and anxiety. (Tr. 321-22). Plaintiff had not yet made an appointment to see a therapist. *Id*.

Plaintiff went to the Hendersonville Medical Center ER on July 17, 2007. (Tr. 345-47). He complained of a headache that was a "10 out of 10" on the pain scale. *Id*. A CT of his head

was normal. *Id*. He returned to Dr. Yim on July 17, 2007 and reported his emergency room visit and stated he wanted to talk to Dr. Yim about his medication. (Tr. 320).

Plaintiff was treated at the Family and Childrens Clinic in Portland, Tennessee from the end of 2007 through 2009. (Tr. 429-44). He was treated for blood in stool and back pain, among other ailments. *Id*.

On February 6, 2008, Plaintiff had a routine follow-up at the Hemostasis and Thrombosis Clinic. (Tr. 385-87). He had no insurance at the time. *Id*. He had complaints of bleeding since he was last at the clinic, but none required factor infusion. *Id*. His treating physician noted Plaintiff was "[a]pplying for disability but I am a bit unclear on what he desires this to be based." (Tr. 385). Plaintiff was noted to have very significant depression. *Id*.

Plaintiff first sought treatment at the Mental Health Cooperative on February 10, 2009. (Tr. 445-65). On that date, his General Assessment of Functioning ("GAF") was measured at 40. (Tr. 448).[2] He was moderately limited in activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaptation to change. (Tr. 445-48). Plaintiff had a noted history of noncompliance with mental health treatment due to paranoia. (Tr. 449). On March 3, 2009, Plaintiff reported paranoia about medication due to his mother having a bad

---

[2]The Global Assessment of Functioning test is a
> subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

reaction to medication and dying. (Tr. 452). He also suffered from insomnia, numbness, and a phobia of doctors and hospitals. *Id*. At an appointment on May 15, 2009, Plaintiff reported situational stressors, including that he may lose his home due to failure to pay back taxes and that he had problems with his ex-wife. (Tr. 463-65).

On February 28, 2009, Plaintiff was treated at the Sumner Medical Emergency Room for back pain and right upper lid pain due to a sty. (Tr. 418-19). Plaintiff had run out of Lortab and Valium, and the emergency room physician would not refill the prescriptions because Plaintiff's primary care physician would not refill them. *Id*.

Plaintiff returned to the Hemostasis and Thrombosis Clinic on April 8, 2009, complaining of pain in his back, joints, and abdomen and blood-tinged stool. (Tr. 421-28). He was encouraged "once again" to see a gastrointestinal specialist. *Id*. Insurance issues had precluded previous visits, but Plaintiff thought he had coverage. *Id*. Plaintiff's chronic and unremitting pain was, in his physician's opinion, unlikely to improve anytime soon. *Id*.

In a pain questionnaire, Plaintiff stated he was in constant pain. (Tr. 155-58). He stays home most of the time but sometimes goes to the park or lake with his family. *Id*. He suffers from migraines and has constant right leg pain when standing or walking for long periods. *Id*. He stated in his function report that he is able to take care of his children and feed the animals. (Tr. 160-76). He cannot do most cleaning, cooking, or yard work due to pain, and he suffers from insomnia. *Id*. He is able to prepare foods or meals weekly. *Id*. He requires help with his personal needs when he has a bleed. *Id*. He does not drive because he lacks a license. *Id*. Plaintiff fishes approximately once per week and also visits with family and friends at about the same frequency. *Id*. He cannot lift more than 10 to 20 pounds without pain. *Id*. He has pain when using his hands

or standing due to nerve damage. *Id*. He is afraid of taking medication due to complications; his mother died from a bad combination of medications. *Id*.

On November 9, 2007, Albert J. Gomez, M.D., performed a consultative exam on Plaintiff. (Tr. 349-52). He noted Plaintiff has a history of hemophilia and chronic depression with new complaints of chronic neck and lower back pain and chronic headaches. *Id*. His symptoms decreased with medications and rest, and there was no surgery performed on Plaintiff's neck or back. *Id*. Plaintiff had an MRI in January 2007 that showed a bulging disc, according to the Plaintiff, but the actual MRI was normal. *Id*. Dr. Gomez observed moderate tenderness to palpation in both shoulders, full range of motion in the right and left shoulders except for abduction; Tinel sign and Phalen sign positive on right and negative on the left; and moderate tenderness to palpation in the lumbar spine. *Id*. Plaintiff could do tandem walk, heel walk, and toe walk normally but could not squat. *Id*. He could stand on one leg normally. *Id*. Plaintiff had moderate tenderness to palpation to the muscles of the right upper and right lower leg. *Id*. Dr. Gomez believed Plaintiff could occasionally lift 20 pounds and could sit or stand at least 6 hours in an 8-hour day. *Id*.

Kathryn Steele, Licensed Clinical Psychologist, assessed Plaintiff's mental status on December 6, 2007. (Tr. 353-56). She noted Plaintiff reported seeing a therapist at Middle Tennessee Christian for a few months in 2001. *Id*. He reported being hospitalized on several occasions for depression, suicidal ideation, and attempted suicide, but there were no records of this. *Id*. Plaintiff reported having "major bleeds" on a regular basis. *Id*. He was arrested on three occasions in 2003 for simple possession of marijuana and two DUI charges. *Id*. His statements during the interview were, according to Ms. Steele, consistent with religious preoccupation. *Id*.

He had a blunted affect, depressed and sad mood, appeared anxious, and cried throughout the interview. *Id*. Plaintiff stated he had suicidal ideation six months ago, and he had disorganized thought processes. *Id*. Ms. Steele assessed his GAF at 50. *Id*. She believed he had low average intellectual functioning, with disorganized and confused thought content. *Id*. She believed he could remember and understand simple and complex instructions in a structured setting, but with some confusion, possibly due to prescription drugs. *Id*. He could carry out simple, short instructions in a structured environment. *Id*. He could interact appropriately with others, but he would have moderate difficulty adapting to changes in his environment. *Id*. He was not competent to manage his finances. *Id*.

Thomas D. Neilson, Psy.D., completed a Psychiatric Review Technique dated December 21, 2007. (Tr. 358-75). He believed Plaintiff has mild restriction of activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence, and pace. *Id*. He noted Plaintiff had no episodes of decompensation. *Id*. Dr. Neilson believed Plaintiff had no more than moderate limitations and that his report was "partially credible;" the totality of the evidence indicated Plaintiff's impairment was less than marked. (Tr. 370). He believed Plaintiff is able to understand and remember simple and detailed, non-complex tasks; can sustain concentration and persistence for those tasks, despite periods of increased signs and symptoms; will experience some but not substantial difficulty interacting with the general public and supervisors and can relate to co-workers; and can set limited goals and adapt to infrequent change. (Tr. 374).

Reeta Misra, M.D., completed an RFC assessment for Plaintiff dated December 27, 2007. (Tr. 376-83). Dr. Misra believed Plaintiff could occasionally lift 20 pounds, could frequently lift

10 pounds, and could stand, walk, and/or sit about 6 hours. *Id*. Plaintiff was not limited in pushing or pulling beyond the lifting weight limits. *Id*. Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. *Id*. He could not climb ladders, rope, or scaffolds. *Id*. He was limited in handling and fingering. *Id*.

James B. Millis, M.D., completed an additional RFC dated March 19, 2008. (Tr. 408-15). This was identical to Dr. Misra's assessment, with the exception that Plaintiff had no postural limitations and must avoid all exposure to hazards. *Id*.

At his hearing, Plaintiff testified that he only completed the eleventh grade due to his then-girlfriend's pregnancy. (Tr. 26). He currently lives with his second wife and three children. *Id*. He smokes occasionally and smokes approximately one-half pack per day if he smokes. (Tr. 27). He stopped drinking alcohol approximately five years ago. *Id*.

Plaintiff tried working for two days at a fast food restaurant in 2008. (Tr. 28). Before that time, his last full-time job was at a cardboard box factory, which he held for about a year before leaving in 2006. (Tr. 29). He left that job due to severe neck, back, and head pain and having bleeds in his abdomen. *Id*. He testified he was in a wheelchair and on crutches for four months. *Id*. His testimony is somewhat unclear, but it appears he had severe migraines and left or was fired due to absenteeism because of a bleed. (Tr. 31). He had a groin muscle tear that caused a bleed in 2006 and resulted in short-term disability. *Id*. While employed, Plaintiff testified he generally got along with people, but he stayed to himself and has trust issues with a lot of people. (Tr. 32). Plaintiff was fired from seven to eight jobs due to absenteeism. (Tr. 50-51).

Plaintiff believes his hemophilia is the number one problem preventing him from working. (Tr. 33-36). He discussed several bleeds he has had over the years. *Id*. He knows he has

11

a bleed when he experiences cramping and muscle spasms. (Tr. 45-46). He bleeds when he has a bowel movement. (Tr. 49). His bleeds have gotten more frequent over time, and recovery can last anywhere from 1-6 months. (Tr. 50).

Plaintiff takes hydrocodone for his migraines. (Tr. 36). His migraines occur at least 4 times a week. (Tr. 52). He has not been able to be treated at a pain clinic due to hemophilia. (Tr. 37-38). Plaintiff testified that he has nerve damage in his arm and pain in his neck and back. (Tr. 40-41). He stated an MRI ordered by Dr. Rutland "a few years back" showed bulging disks. (Tr. 41). After some discussion, Plaintiff's attorney identified this MRI as having occurred on March 5, 2007. (Tr. 42-43).

At the time of the hearing, plaintiff had been receiving mental health treatment at the Mental Health Co-op for approximately three to four months. (Tr. 39). He was unable to get treatment before due to a lack of insurance. *Id*.

Vocational Expert ("VE") Gary Sturgill testified that Plaintiff's past relevant work included the following medium level, semi-skilled jobs: loader operator, molding machine tender, and furnace operator. (Tr. 54). Plaintiff also worked as a cook, which is medium and skilled work. (Tr. 54-55). The ALJ asked the VE to assume the RFC he determined, and the VE testified all past work would be precluded. (Tr. 55-56). Plaintiff could perform light level jobs, according to the VE. (Tr. 56-57). The VE believed Plaintiff could do primarily clerical or office jobs, including information clerk (1,000 in Tennessee and 60,000 nationwide), interviewer (1,400 in Tennessee and 70,000 nationwide), and general office clerk (1,200 in Tennessee and 53,000 nationwide). (Tr. 57). The VE noted that these were representational jobs, not an exhaustive list. *Id*. If Plaintiff's testimony that he must lie down in a dark room three to four times a week due to

migraine headaches were fully credible, no jobs would be available. (Tr. 57-58).

Plaintiff's attorney asked the VE whether the jobs identified required frequent interaction with the general public, and the VE stated that they would. (Tr. 59). The jobs would also require accuracy. *Id*. The VE also noted that three or more absences per month would likely result in termination. (Tr. 60).

## III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

In his Motion, Plaintiff alleges three errors. First, the ALJ failed to properly evaluate Plaintiff's credibility, and the credibility assessment lacks evidentiary support. Second, the ALJ did not consider all relevant evidence in evaluating Plaintiff's mental impairment. Third, the ALJ's finding that Plaintiff could perform representative jobs identified by the VE is not supported by substantial evidence.

A.   Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the

decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.  Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.*; *see also Moon*, 923 F.2d at 1181. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through VE testimony. *See Wright*, 321 F.3d at *616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

C.  <u>The ALJ Properly Evaluated Plaintiff's Crediblity</u>

Plaintiff argues that the ALJ improperly assessed his credibility in violation of SSR 96-7p, 1996 WL 374186 (S.S.A. 1996). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Like any other factual finding, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003). Here, the Magistrate

Judge believes the ALJ properly evaluated Plaintiff's credibility.

Plaintiff first argues that the ALJ's credibility assessment is "meaningless boilerplate." While the ALJ used standard language to describe his conclusion, he also listed several reasons for discounting Plaintiff's credibility. (Tr. 17-18). He noted that Plaintiff has had few recent bleeding episodes, with none requiring transfusion in more than two years, and that Plaintiff's lumbar diagnostic tests and brain scans revealed only mild abnormalities. (Tr. 18).

Plaintiff argues that his lack of insurance should have been considered in the credibility assessment, as the ALJ cites Plaintiff's lack of care from 2002 through 2006. (Tr. 18). SSR 96-7p provides, in relevant part:

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96-7p. One "good reason" for failure to seek medical treatment is the inability to afford treatment and lack of access to free or low-cost medical services. *See id*.

It is clear to the Magistrate Judge that the ALJ did consider whether Plaintiff was insured during that time period. (Tr. 18). Plaintiff further argues that the ALJ should not have considered this time period in his credibility assessment, because it was prior to Plaintiff's alleged onset date. The ALJ apparently believes that Plaintiff obtained insurance coverage in or around 2007. (Tr. 18). Plaintiff disputes this statement, as he is listed as "guarantor" for his treatment at the Portland

16

Family and Children's Clinic in 2007-2009, which usually indicates a lack of insurance. (Tr. 429-44). Plaintiff did report he "likely" had insurance coverage to see a gastroenterologist in April 2009. (Tr. 421-28). Therefore, there is some dispute as to whether Plaintiff had insurance coverage prior to 2009. It is Plaintiff's obligation to establish his disability by a preponderance of the evidence, however, and Plaintiff failed to provide a clear record regarding the period he had insurance coverage. *See Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990).

Even assuming Plaintiff did not obtain health insurance until 2009, the Magistrate Judge believes the ALJ properly evaluated Plaintiff's credibility. Plaintiff has alleged that his hemophilia is the primary problem preventing him from work. (Tr. 33-36). He complained of numerous bleeds at a routine follow-up on February 6, 2008 at the Hemostasis and Thrombosis Clinic, but there are no records that he sought medical treatment for these bleeds, and they were apparently not so severe that Plaintiff required a factor infusion. (Tr. 385). After a bleed in January 2007, Plaintiff was seen for routine follow-ups at the Hemostasis and Thrombosis Clinic, on an approximately annual basis. (Tr. 385-406, 421-28). Only a few months prior to his alleged onset date, on July 19, 2006, Plaintiff informed an emergency room physician that he had not had a problem with a bleed in several years. (Tr. 302-05). The Magistrate Judge believes the ALJ properly assessed Plaintiff's credibility on this point and had sufficient evidence for his conclusion.

With regard to Plaintiff's allegations of degenerative disc disease and headaches, the ALJ correctly pointed out that diagnostic tests have failed to support these allegations. (Tr. 18, 306-07, 345-47, 466-75). The Magistrate Judge therefore believes the ALJ committed no error in

evaluating Plaintiff's credibility.

D.     The ALJ Properly Evaluated Plaintiff's Mental Impairment

When a claimant alleges disabling mental impairment, an ALJ is required to evaluate first whether the claimant has a "medically determinable mental impairment" and then to rate the "degree of functional limitation resulting from the impairment." 20 C.F.R. § 404.1520a. The ALJ must evaluate the so-called "A" criteria, consisting of the "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment. *Id.* The ALJ must also evaluate the "B" criteria, which rate the claimant's degree of functional limitation and consist of four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* The ALJ's application of these criteria must be documented in his decision. *Id.*

Plaintiff argues that the ALJ erred by rejecting the GAF scores assigned to Plaintiff by Dr. Steele, the consultative examiner, and by the Mental Health Cooperative. Moreover, Plaintiff argues that the ALJ failed to adequately consider the term "moderate" on Plaintiff's CRG form. The Magistrate Judge believes the ALJ had sufficient evidence for his determination.

As an initial matter, GAF scores are not themselves determinative of disability. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503 n. 7 (6th Cir. 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). Dr. Steele assigned Plaintiff a GAF score of 50, while the Mental Health Cooperative assigned a GAF score of 40, both of which indicate serious symptoms. (Tr. 445-47, 353-56) Rather than blindly accepting the assigned GAF scores,

18

however, the ALJ examined Plaintiff's medical records and determined Plaintiff had a serious impairment that limited him in some areas of residual functioning. (Tr. 15-17). As the ALJ noted, Dr. Steele concluded Plaintiff could understand and carry out short, simple instructions and could interact with supervisors and co-workers, with moderate difficulty adapting to change. (Tr. 353-56). She recommended a representative payee. *Id*. The Mental Health Cooperative records indicate Plaintiff had moderate limitations in activities of daily living, interpersonal functioning, concentration/task performance/pace, and adaptation to change. (Tr. 445-65). However, Plaintiff had some improvement with medications and therapy, and his problems were considered to be exacerbated by situational stressors. *Id*. The ALJ examined Plaintiff's mental health records in great detail and determined Plaintiff was limited to some extent and essentially adopted Dr. Steele's conclusions regarding Plaintiff's limitations. (Tr. 12-13, 353-56). The Magistrate Judge therefore believes the ALJ did not err in this determination.

E.   The ALJ's Finding Plaintiff Could Perform Representative Jobs is Supported by Substantial Evidence

Plaintiff claims the ALJ erred by failing to include Plaintiff's expected level of absenteeism, need to elevate his lower extremities, and level of pain in his hypothetical question to the VE. Plaintiff essentially argues that these limitations should have been included in the ALJ's determined RFC. For the reasons addressed above, the ALJ properly evaluated Plaintiff's credibility and determined that his complaints were not fully credible. Presumably, these complaints include Plaintiff's assertions regarding absenteeism, the need to elevate his lower extremities, and pain. Plaintiff is apparently seeking to attack the credibility determination in a different way by attacking the VE testimony. However, the ALJ made an appropriate credibility determination, supported by substantial evidence, and questioned the VE regarding his determined

RFC. (Tr. 55-56). As the ALJ did not give full credibility to Plaintiff's testimony, the ALJ was not required to credit the VE's testimony that Plaintiff would be unable to work if his testimony were found fully credible. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994). Therefore, the Magistrate Judge believes the ALJ's finding on this point is supported by substantial evidence.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 13th day of January, 2012.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge